**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MELISSA JOHNSON<br>4728 Kempsville Greens Parkway<br>Virginia Beach, VA 23462,<br><br>                    Plaintiff,<br>          v.<br><br>JOHN PHELAN, SECRETARY OF<br>THE NAVY, UNITED STATES OF<br>AMERICA, in his official capacity,<br>1000 Navy Pentagon<br>Washington, DC 20350,<br><br>UNITED STATES DEPARTMENT OF THE<br>NAVY<br>1000 Navy Pentagon<br>Washington, DC 20350, and<br><br>BOARD FOR CORRECTION OF NAVAL<br>RECORDS<br>701 S. Courthouse Road<br>Building 12, Suite 1001<br>Arlington, VA 22204,<br><br>                    Defendants. | Civil Action No.<br><br><br>**COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF** |

## I.      INTRODUCTION

1.      Plaintiff Melissa Johnson, a veteran of the United States Navy ("Navy" or "the Navy"), brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., for judicial review of a final decision by the Board for Correction of Naval Records ("BCNR" or "Board") denying her request for correction of her records to reflect disability retirement for amnestic disorder.

1

2.      Melissa Johnson developed severe and progressive cognitive impairment, ultimately diagnosed as an amnestic disorder, while serving on active duty. As a result of that condition, she became unable to perform the duties of her office, grade, rank, or rating.

3.      Despite overwhelming evidence that Ms. Johnson could not stand watch, could not perform her assigned duties as an officer, and was removed from operational service and deemed non-deployable, the Navy's Physical Evaluation Board ("PEB") found her "fit for duty."

4.      Ms. Johnson sought correction of this error through the BCNR, requesting retroactive medical retirement. The BCNR denied relief, concluding that there was "insufficient evidence" that she had an unfitting condition at the time of discharge and adopting an advisory opinion that relied heavily on normal testing and the prior PEB finding.

5.      The BCNR's decision is arbitrary, capricious, contrary to law, and unsupported by substantial evidence. The Board failed to apply the governing statutory and regulatory standard—whether Ms. Johnson could reasonably perform the duties of her office, grade, rank, or rating—and instead relied on the absence of "objective" pathology and the existence of normal testing. In doing so, the Board ignored material evidence of functional impairment, including her removal from operational duties and non-deployable status, which are directly relevant to the fitness determination.

6.      The Board further failed to provide a reasoned explanation for rejecting favorable evidence, including the Department of Veterans Affairs' contemporaneous 30% disability rating for amnestic disorder effective shortly after discharge. Rather than reconciling this evidence, the BCNR dismissed it as post-service and adopted the advisory opinion without independent analysis, in violation of the APA's requirement that the agency articulate a rational connection between the facts found and the decision made.

2

7.      The BCNR also improperly elevated the prior PEB finding of fitness, treating it as effectively dispositive, rather than conducting the required de novo review of "error or injustice" under 10 U.S.C. § 1552. Its reliance on the absence of "organic disease" and "normal testing" reflects application of an incorrect legal standard, as the fitness inquiry turns on functional capacity, not diagnostic certainty.

8.      Because the BCNR failed to consider important aspects of the problem, relied on factors not permitted by law, and failed to provide a reasoned explanation grounded in the record, its decision must be set aside.

9.      Ms. Johnson seeks an order vacating the BCNR's decision and remanding the matter to the Secretary of the Navy with instructions to apply the correct legal standards and to fully and fairly evaluate whether her amnestic disorder rendered her unfit for continued service

## II.      <u>JURISDICTION AND VENUE</u>

10.      Plaintiff brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*. ("APA").

11.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA. 10 U.S.C. §§ 1201(b), 1203(b); 5 U.S.C. §§ 701-06.

12.      Plaintiff seeks exclusively declaratory and other equitable relief. *See* 5 U.S.C. § 702. Plaintiff seeks a declaration that the BCNR's denial of Plaintiff's application was arbitrary, capricious, unsupported by substantial evidence, and contrary to law, and a remand to the Navy for a new decision in accordance with applicable law.

13.      The BCNR's denial of Plaintiff's application was a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

14. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Navy is an officer of the United States and because a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia. Venue is also proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

15. In accordance with 28 U.S.C. § 2401, this action is brought within six years of the BCNR's decision.

### III.    PARTIES

16. Plaintiff Melissa Johnson is a former officer of the United States Navy. She served honorably on active duty from November 1, 1990 to March 31, 2005. Ms. Johnson is a United States Citizen and resides in Virginia Beach, Virginia.

17. Defendant John Phelan is the Secretary of the United States Navy, and is named solely in his official capacity. He is the chief officer of the United States Navy, and exercises authority, direction, and control over the United States Navy. Defendant Phelan is authorized by 10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy when he considers it necessary to correct an error or remove an injustice. Upon information and belief, Defendant Phelan performs a significant amount of his duties within this district.

18. Defendant Board for Correction of Naval Records ("BCNR" or "the Board") is an agency of the United States Department of the Navy, located in Arlington, Virginia. The BCNR is the board of civilians established by the Secretary of the Navy which, pursuant to 10 U.S.C. § 1552, considers applications filed before it for the purposes of determining whether an applicant's Navy military record should be changed to correct error or injustice.

## IV.    FACTUAL ALLEGATIONS

### A.  Military Disability and Retirement Framework

19.     Title 10, U.S.C., chapter 61, establishes the military's Disability Evaluation System ("DES"), and provides the Secretaries of the Military Departments with authority to retire or separate service members who are "unfit to perform the duties of the member's office, grade, rank, or rating" due to a compensable condition. 10 U.S.C. § 1201(a).

20.     The Department of Defense Department of the Navy has implemented this statutory mandate through binding regulations.

21.     Under DoDI 1332.38, a member "shall be considered unfit when the evidence establishes that the member, due to physical disability,  is unable to reasonably perform the duties of his or her office, grade, rank, or rating." U.S. Dep't of Def. Instruction ("DoDI") 1332.38 § E3.P3.2.1 (1996).

22.     Navy regulations adopt the same standard and require that fitness determinations be based on the member's ability to perform assigned duties. Sec'y of the Navy Instruction ("SECNAVINST") 1850.4E § 3302 (2002).

23.     Importantly, the determination as to whether a service member is unable to perform her duties focuses on the duties of that service member's office, grade, rank, or rating. *See* 10 U.S.C. § 1201.

24.     The governing regulations further make clear that a medical condition constitutes a compensable disability when it is of such severity that it interferes with the member's ability to adequately perform required duties. DoDI 1332.38 § E2.1.25. The term "office" means a "position of duty, trust, authority to which an individual is appointed". DoDI 1332.38 § E2.1.21.1.[1] "The

---

[1] The term "officer" means a commissioned warrant officer. *See* 10 U.S.C. § 101(b)(1).

term 'grade' means a step or degree, in a graduated scale of office or military rank, that is established and designated as a grade by law or regulation." 10 U.S.C. § 101(b)(7). "The term "rank" means the order of precedence among members of the armed forces." *Id.* § 101(b)(8). The term "rating" reflects an individual service member's occupational field. *Id.* § 101(b)(9) ("The term 'rating' means the name (such as 'boatswain's mate') prescribed for members of an armed force in an occupational field."); DoDI 1332.38§ E2.1.21.4. [2] Additionally, the Navy uses "designator" codes to classify, identify, and document occupational field duties and qualifications. *See* Dep't of the Navy, *Manual of Navy Officer Manpower and Personnel Classifications* , Vol. I, at A-6 (Jan. 2010).

### B. The Disability Evaluation System

25.    The DES is initiated by referral and consists of several phases of evaluation and review that result in a final disability determination for a referred individual. In the Navy, the DES process begins when a commanding officer refers a service member for medical evaluation. *See* SECNAVINST 1850.4E §§ 3102, 3106.

26.    If a wound, illness, or injury results in a permanent condition or has long-lasting, duty-limiting effects, a service member is then formally referred to the DES by a physician or their commander. *See* DoDI 1332.38 § E4.A1.1.2.11.4.

27.    After referral, the first formal phase of the DES process involves review by a Medical Evaluation Board ("MEB"), which documents the service member's medical conditions and duty limitations. *See* DoDI 1332.38 §§ E4.A1.1.2.11.1-2; SECNAVINST 1850.4E § 3104(a).

28.    As part of the MEB process, a Narrative Summary ("NARSUM") is prepared, which provides a detailed clinical description of the service member's medical conditions, course

---

[2] The term "rate" means the name (such as "chief boatswain's name") for members in the same rating or other category who are in the same grade. 10 U.S.C. § 101(b)(9).

of treatment, functional limitations, and prognosis. The NARSUM is intended to synthesize the medical evidence and specifically address how the member's conditions affect the ability to perform military duties, and it serves as the principal medical document informing the PEB's fitness determination.

29.    The MEB does not state a conclusion of unfitness due to physical disability, or assign a disability percentage rating, but instead identifies conditions and associated duty limitations to inform whether referral to the PEB is required. *See* SECNAVINST 1850.4E § 3104(a).

30.    If the MEB determines that one or more of the service member's medical conditions fail retention standards or otherwise impose duty limitations, the member must be referred to a PEB for a determination of fitness. *See* DoDI 1332.38 § E4.A1.1.2.11.4.

31.    The PEB is responsible for determining a service member's unfitness for duty as a result of one or more disabilities. DoDI 1332.38 § E3.P1.3.1; SECNAVINST 1850.4E § 3302(a).

32.    A service member "shall be considered unfit when the evidence establishes that the member . . . is unable to reasonably perform the duties of his or her office, grade, rank, or rating ([also] called duties)[.]" DoDI 1332.38 § E3.P3.2.1; SECNAVINST 1850.4E § 3302(a).

33.    Per DoDI 1332.38, determining whether a service member can reasonably perform her duties includes four relevant considerations, the first of which is whether the service member can reasonably perform the "common military tasks" associated with her office, grade, rank, or rating. DoDI 13332.38 § E3.P3.4.1.1; *see also* SECNAVINST 1850.4E § 3304(a)(1). These tasks depend on the actual office, grade, rank or rating of the service member. For example, if a service member is routinely required to fire her weapon, perform field duty, or wear load bearing

7

equipment/protective gear, the fitness determination for her would need to look at whether she could reasonably perform those tasks. *Id.*

34.    Three additional required considerations include whether the service member can take and pass the required physical fitness test; whether the service member is deployable; and whether the service member's condition causes loss of qualification for specialized duties. DoDI 1332.38 §§ E3.P.3.1.2-4; *see also* SECNAVYINST 1850.4E § 3304(a)(2)-(4).

35.    The governing framework thus requires a functional assessment of the service member's actual ability to perform assigned duties, as reflected in the medical evidence and the NARSUM, and does not permit a finding of fitness based solely on the absence of objective findings or normal testing.

36.    In addition, the PEB may consider whether the member's condition represents a decided medical risk to himself or to the welfare of other members, or imposes unreasonable requirements on the military to maintain or protect the member. DoDI 1332.38 § E3.P3.2.2; *see also* SECNAVINST 1850.4E § 3302(b)(1)-(2).

37.    The PEB's analysis is constrained to whether a service member can reasonably perform the duties of her office, grade, rank or rating. The regulations do not grant the PEB authority to make a fitness determination based on whether a service member can reasonably perform duties that are *outside* his or her office, grade, rank, or rating.

38.    The PEB process has four possible outcomes. In particular, a service member can be found:

    a.  Fit for duty;

    b.  Unfit for duty, but ineligible for disability benefits because, among other reasons, the disability condition was not incurred in the line of duty, existed prior to service,

was the result of intentional misconduct or willful neglect, or was incurred during an authorized absence;

c.   Unfit for duty and eligible for medical retirement with monthly disability retirement pay and other benefits; or

d.   Unfit for duty and eligible for medical separation with one lump-sum severance payment.[3]

39.   If a service member is found unfit and eligible for either a medical retirement or medical separation, the PEB must assign a percentage disability rating for each unfitting condition, and must use the Veterans Affairs Schedule for Rating Disabilities in doing so. *See* 10 U.S.C. §§ 1201, 1203, National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1642(a), 122 Stat 465 (codified at 10 U.S.C. § 1216a).

40.   If a military department assigns the service member a combined disability rating of 30% or more, the service member is medically retired. A medical retiree is entitled to, among other things, military health care (TRICARE) for the retiree and the retiree's spouse and minor children, as well as access to military bases, commissary privileges, the right to wear the uniform on appropriate public occasions, space-available travel on military aircraft, disability retirement pay, military funeral arrangements, and burial privileges in national cemeteries.

**C. Framework Governing Psychiatric and Cognitive Conditions**

41.   At the time of Ms. Johnson's service and separation, the Department of Defense and the Department of the Navy required that psychiatric and cognitive conditions be evaluated in accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV").

---

[3] Service members who receive a disability rating of less than 30% are not eligible for medical retirement and may instead be eligible for medical separation. *See, e.g.,* 10 U.S.C. §§ 1201, 1203.

42.     DoDI 1332.38 expressly mandated that the DES be administered in consonance with the DSM-IV and required consideration of all Axis I and Axis II diagnoses in determining whether a condition may impair a service member's ability to perform military duties.

43.     SECNAVINST 1850.4E, which implements DoDI 1332.38 within the Department of the Navy, incorporates that requirement and likewise requires that mental health conditions be evaluated consistent with the DSM-IV diagnostic framework.

44.     The DSM-IV is therefore not merely advisory, but binding on the evaluation of psychiatric and cognitive conditions within the DES. The Navy may not disregard DSM-IV diagnostic criteria or substitute alternative, extra-regulatory requirements when evaluating whether a service member has a compensable or potentially unfitting condition.

45.     The DSM-IV expressly recognizes Amnestic Disorder as an Axis I diagnosis, defined as a "disturbance in memory" characterized by an inability to learn new information or recall previously learned information, where the impairment is sufficiently severe to interfere with social or occupational functioning.

46.     Critically, the DSM-IV includes a category of "Amnestic Disorder Not Otherwise Specified," which applies where a service member exhibits disabling memory impairment but the underlying cause cannot be identified. This diagnostic category expressly contemplates conditions of unknown or non-organic etiology.

47.     The DSM-IV thus rejects the distinction between "organic" and "non-organic" mental disorders as a prerequisite to diagnosis. Instead, it focuses on the presence of clinically significant symptoms and their functional impact.

48.     Ms. Johnson's condition satisfies the DSM-IV criteria for amnestic disorder. The record establishes that she experienced a disturbance in memory marked by an inability to recall

10

routine information, repeated episodes of "lost time," and reliance on compensatory strategies for basic daily functioning, all of which significantly interfered with her occupational performance.

### D.  Governing Unsuitability and Administrative Separation Framework

49.     At the time of Ms. Johnson's separation on March 31, 2005, administrative separation of officers was governed by SECNAVINST 1920.6B and its implementing provisions in the MILPERSMAN.[4]

50.     The MILPERSMAN expressly identifies SECNAVINST 1920.6B as the "Governing Directive" for officer separations, confirming that this framework controlled all administrative separation actions at the time of Ms. Johnson's discharge.

51.     Under that framework, separation of an officer—whether for cause, unsuitability, or other administrative grounds—was a formal legal process requiring approval by the Secretary of the Navy and governed by specific procedural and substantive standards. The regulation emphasizes that an officer's commission constitutes a protected legal status that may be terminated only through authorized processes, including separation for cause.

52.     Critically, the administrative separation framework did not operate independently of the DES. As reflected in SECNAVINST 1850.4E, also in effect at the time, medical conditions that impair a service member's ability to perform the duties of office, grade, rank, or rating must be evaluated through the DES.

53.     Thus, where a service member's alleged "unsuitability" is based on medical limitations—as in Ms. Johnson's case—the governing regulations required the Navy to determine

---

[4] The Naval Military Personnel Manual (MILPERSMAN) in its current form was first issued under Navy Regulations, 1990, Article 0105. The MILPERSMAN is a living document used primarily to administer Navy military human resources policy and procedures.

whether those limitations constituted an unfitting disability under the DES, rather than bypassing disability processing through administrative separation.

### E. Ms. Johnson's Military Service and Medical Condition

54.     Ms. Johnson served in the Navy for over fourteen years in a variety of technical and operational roles, including Shipboard Maintenance Technician, Communications Equipment Technician, and Tactical Air Navigation Technician.

55.     In February 2003, she was commissioned as an officer and assigned as an Assistant Combat Information Center Officer, a role requiring sustained cognitive functioning, situational awareness, and the ability to stand watch and perform operational duties at sea.

56.     Beginning in approximately 2003, Ms. Johnson developed severe and progressive memory loss and cognitive impairment.  Her condition worsened to the point that she struggled to perform basic daily tasks. and required rigid routines and written reminders to function. Contemporaneous medical records document that she had to write lists consistently to accomplish her tasks and experienced confusion with everyday activities.

57.     Ms. Johnson experienced repeated episodes of "lost time," including while driving and while performing duties aboard her ship. There were reported episodes in which she would suddenly find herself further along a route without recollection of how she got there, as well as episodes occurring while aboard ship performing routine tasks.

58.     As her condition progressed, she became unable to perform essential duties of her position, including standing watch and fulfilling her responsibilities as an officer. Her symptoms resulted in concrete operational failures, including missing required ship movement and difficulty executing routine responsibilities.

59.     Ms. Johnson underwent Neuropsychological testing in February 2004.  Although the testing was within normal limits, providers documented significant and worsening subjective cognitive impairment in the past 2-3 years that had become more pronounced in the past 4-5 months. Ms. Johnson reported maintaining compensatory strategies, including maintaining a very rigid schedule  and detailed written notes in order to prevent herself from forgetting routine tasks such as brushing her teeth

60.     In April 2004, at the request of her commanding officer, Ms. Johnson underwent psychiatric evaluation and was placed on Limited Duty ("LIMDU") due to her cognitive impairment. Ms. Johnson reported that she couldn't seem to remember anything. She also again reported multiple episodes of lost time, two while driving and one while on the ship performing her duties. The staff psychiatrist, Dr. Coble, deferred a definitive diagnosis for further evaluation and recommended memory enhancement classes. Ms. Johnson was returned to full duty with follow up as needed.

61.     On May 12, 2004, the Medical Evaluation Board documented that Ms. Johnson continued to suffer from "short-term memory problems" that had "rapidly worsened over the past 4–6 months," with concrete failures such as "missing a daytime ship movement," "leaving the shower on," and being "confused with normal everyday tasks," requiring her to "write lists consistently to accomplish her tasks." Ex. A at 1, MEB Report. The MEB characterized her condition as "cognitive complaints without any evidence of organic disease", but failed to find that the condition failed retention standards even though pursuant to SECNAVINST 1850.4E, encl. 8, ¶ 8012(m), cognitive disorders require referral to the PEB, "regardless of etiology, when, after adequate treatment, residual symptoms prevent the satisfactory performance of duty." Instead of referral to the PEB, the MEB recommended eight months of LIMDU.

13

62.     By July 2004, Ms. Johnson's symptoms had not resolved. Treatment records reflect that her "[m]emory complaints remain unchanged," while her headaches continued to occur "several times [per] week" and remained "severe." Ex. B at 1, Chronological Record of Medical Care. At that point, the MEB changed its recommendation to referral to the PEB for cognitive complaints.

### F.  PEB Findings and Subsequent Events

63.     Despite her cognitive complaints, on August 12, 2004, Ms. Johnson was found Fit to Continue on Active Duty by the PEB.

64.     That finding was inconsistent with the evidence before the PEB, which demonstrated that Ms. Johnson could not perform the duties of her office, grade, rank, or rating.

65.     Shortly thereafter, on October 7, 2004, Ms. Johnson was screened for sea/overseas duty and found not suitable for operation duties or duties Outside the Continental U.S. (OCONUS). The screener recommended a change of designator to Continental U.S. (CONUS) or shore duty.

66.     On December 7, 2004, Ms. Johnson's commander filled out an operational suitability report for her. The reason for the screening was that Ms. Johnson was found fit for continued service by the PEB, but still had limitations due to her medical conditions. Her command determined that she was not suitable for operational assignments and imposed significant duty limitations, including restrictions on tasks requiring concentration, punctuality, or memory.

67.     Ms. Johnson was removed from the Surface Warfare Officer qualification track and assigned to limited administrative duties.

68.     Ms. Johnson desired to remain on active duty, but did not desire a designator change. Accordingly, the commander recommended that Ms. Johnson be administratively separated.

69.     Ms. Johnson received her separation physical on February 18, 2005. She then was administratively separated from the Navy on March 31, 2005. Her narrative reason for discharge is Secretarial Authority, under separation authority SECNAVINST 1920.6B (providing for separation of officers).

## G. Post-Service Diagnosis and VA Rating

70.     After her discharge, Ms. Johnson sought care from the Department of Veterans Affairs ("VA"). See Ex. C, Decision.

71.     The VA granted service connection for amnestic disorder and assigned a 30 percent disability rating effective April 1, 2005, the day after her discharge, based on "moderate memory disturbance" causing interference with activities of daily living. The VA later increased that rating to 100 percent. Ex. C at 4.

## H. BCNR Proceedings and Decision

72.     In February 2024, Ms. Johnson applied to the BCNR seeking correction of her records to reflect a medical retirement for her unfitting amnestic disorder.

73.     On January 28, 2025, the BCNR denied her application. See Ex. D, Decision Letter.

74.     In its decision, the BCNR acknowledged that Ms. Johnson was "placed on limited duty for eight months due to daily headaches and cognitive complaints without any evidence of organic disease," Ex. D at 2,  that she was subsequently referred to the Physical Evaluation Board ("PEB"), and that on August 12, 2004, the PEB found her "fit to continue on active duty."

75.     The BCNR further acknowledged that Ms. Johnson experienced persistent cognitive complaints, was placed on LIMDU, underwent multiple in-service evaluations, and was "administratively separated after administrative determination of Unsuitability for military service." Ex. D at 2. Notwithstanding these facts, the Board concluded there was  "insufficient evidence"

15

that Ms. Johnson had an unfitting condition at the time of separation because "there was no evidence of organic disease and testing was within normal limits." Ex. D at 2.

76.    In support of its conclusion, the Board stated that Unsuitability is "distinct from Fitness" and reasoned that Ms. Johnson's later diagnosis of amnestic disorder, merely "provided clarity for her post-discharge diagnostic and treatment considerations but does not substantively indicate the in-service determination of FIT for service was made erroneously given the evidence at the time of the PEB determination." Ex. D at 2.

77.    The Board further rejected the probative value of the VA's diagnosis and disability rating, reasoning that VA determinations are "manifestation-based" and do not require a showing of unfitness for military duty.

78.    The BCNR dismissed contemporaneous service evidence, stating there was "no medical evidence that you would be unable to continue to serve," Ex. D at 2-3, disregarding the undisputed facts that Ms. Johnson's was disqualified from operational assignments, removed from the Surface Warfare Officer qualification track, and restricted to non-operational duties, limitations that directly reflect an inability to perform the duties of her office, grade, rank or rating.

## V.    CLAIMS FOR RELIEF

### COUNT I
**Contrary to Law by Requiring the Diagnosis of a Specific Organic Disease
(Violation of the APA 5 U.S.C. § 706(2)(A) –
Arbitrary, Capricious, and Otherwise Not in Accordance With Law)**

80.    Plaintiff realleges and incorporates by reference the Paragraphs 1-79.

81.    The BCNR's January 28, 2025 decision letter constitutes final agency action under the APA. Ms. Johnson's unsuccessful application to the BCNR was the last available administrative remedy for review of her separation from the Navy.

16

82.     The BCNR's denial of Ms. Johnson's application is arbitrary, capricious, and otherwise not in accordance with law because it imposed a requirement that Ms. Johnson demonstrate a diagnosable "organic disease" as a prerequisite to establishing a compensable and potentially unfitting condition.

83.     That requirement violates DoDI 1332.38 and SECNAVINST 1850.4E, which expressly provide that conditions are compensable when they result in functional impairment, including neurological condition—"regardless of etiology"—and require referral into the DES when "residual symptoms prevent the satisfactory performance of duty."

84.     It further violates 10 U.S.C. § 1201, which entitles service members to disability retirement when they are unfit to perform the duties of their office, grade, rank, or rating due to physical disability, without requiring proof of a specific organic pathology.

85.     The BCNR nevertheless upheld the Navy's decision to find Ms. Johnson fit for duty despite her severe memory loss and cognitive deficits, while simultaneously accepting her discharge as "unsuitable" based on those same symptoms, contending that the "evidence at the time of the PEB determination" did not show that her symptoms were the result of an "organic disease." Ex. D at 2.

86.     An organic disease is one attributable to identifiable structural or physiological pathology, whereas a functional disease refers to conditions presenting with symptoms that are not explained by currently identifiable biological abnormalities.[5]

---

[5] *See* National Center for Biotechnology Information, *The functional–organic distinction: a persistent problem in psychiatry*, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC7338913/ (describing the distinction as differentiating conditions explained by diagnosable biological changes from those that are not).

87.    Thus, the BCNR treated the absence of a measurable physical defect in tissues, organs, or body systems as dispositive, effectively requiring that Ms. Johnson identify a specific organic pathology in order to qualify for disability processing.

88.    That requirement is contrary to law. Neither DoD nor Navy regulations governing the DES require the diagnosis of a specific organic disease and, in fact, explicitly contemplate functional conditions and conditions of unexplained etiology as potentially unfitting.

89.    At the time of Ms. Johnson's discharge, both DoD and Navy regulations governing the DES contained a list of qualifying conditions that was expressly "not all-inclusive," requiring consideration of conditions not specifically identified if they meet the standard for unfitness.

90.    As to neurological conditions, both regulations specify that any "neurological condition, regardless of etiology" is eligible for DES processing "when, after adequate treatment, residual symptoms prevent the satisfactory performance of duty." DODI 1332.38 § E4.12.13; SECNAVINST 1850.4E, ¶ 8012(m).

91.    For psychiatric disorders, both regulations require that the Navy administer the DES "in consonance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSMIV)," and to consider "all AXES I and II diagnoses" from the DSM-IV as potentially impairing military functioning. DODI 1332.38,§§ E4.13.1.1., E4.13.1.3; SECNAVINST 1850.4E, ¶ 8012(m), § 8013(a)(3).

92.    The DSM-IV, introduced in 1994, eliminated the distinction of mental disorders as organic or non-organic[6] after advancement in mental health found such classification flawed.[7]

---

[6] https://www.sciencedirect.com/science/article/abs/pii/S1876201809000586.
[7] https://pubmed.ncbi.nlm.nih.gov/1734746/.

93.     Moreover, DSM-IV expressly recognizes Amnestic Disorder Not Otherwise Specified,[8] which applies where disabling memory impairment exists without an identifiable organic cause.

94.     The DSM-IV therefore expressly contemplates the precise condition presented here: a disturbance in memory severe enough to impair occupational functioning without a known organic etiology.

95.     The BCNR nevertheless required that Ms. Johnson be diagnosed with an "organic disease" or some other identifiable pathology explaining her symptoms before recognizing her condition as potentially unfitting.

96.     This requirement is inconsistent with the DSM-IV, contrary to DoDI 1332.38 and SECNAVINST 1850.4E, and reflects the application of an incorrect legal standard.

**COUNT II**
**Finding "No Medical Evidence" While Ignoring Material Record Evidence**
**(Violation of the APA 5 U.S.C. § 706(2)(A) –**
**Arbitrary, Capricious, and Otherwise Not in Accordance With Law)**

97.     Plaintiff realleges and incorporates Paragraphs 1 through 96.

98.     The BCNR's decision is arbitrary, capricious, contrary to law, and unsupported by substantial evidence because it concluded that there was "no medical evidence" that Ms. Johnson was unable to continue to serve while failing to consider and reconcile substantial, material medical and service evidence in the record demonstrating the opposite, including contemporaneous service evidence and highly probative VA medical findings.

---

[8] DSM-IV defines amnestic disorder as " disturbance in memory marked by inability to learn new information (anterograde amnesia) or to recall previously learned information or past events (retrograde amnesia) that is severe enough to interfere markedly with social or occupational functioning or represents a significant decline from a previous level of functioning."

99.    Courts have repeatedly held that the BCNR may not disregard VA evidence or disability ratings without providing a reasoned explanation grounded in the record. *See U-Ahk-Vroman-Sanchez v. United States DOD*, No. 19-cv-3141, 2021 U.S. Dist. LEXIS 21139 (D.D.C. Feb. 4, 2021); *see also Alver Valles-Prieto v. United States*, 159 Fed. Cl. 611 (2022) (holding that the Board fails the substantial evidence test "when it decline[s] to consider plaintiff's disability ratings as determined by the VA"); *Keltner v. United States*, 165 Fed. Cl. 484 (2023) (holding that the Board must weigh VA disability ratings and rationally explain why they do not follow them).

100.    In particular, it is arbitrary and capricious for a board to dismiss VA evidence based solely on the general distinction between VA disability compensation and military fitness determinations, without analyzing the substance of the medical findings or explaining why they are not persuasive. *U-Ahk-Vroman-Sanchez*, 2021 U.S. Dist. LEXIS 21139 (finding it arbitrary and capricious when "the Board did not explain in any detail why the VA's evidence was not 'satisfactory evidence . . .' and thus was insufficient"). But that is exactly what the BCNR did in Ms. Johnson's case.

101.    The BCNR stated that it "was not persuaded by [Ms. Johnson's] VA evidence" because VA disability determinations are "manifestation-based without a requirement that unfitness for military duty be demonstrated." Ex. D at 3.

102.    The BCNR conducted no meaningful analysis of the VA medical evidence. It did not evaluate the underlying diagnosis, did not assess the clinical findings, and did not explain why the VA's conclusions regarding Ms. Johnson's condition were inaccurate or inconsistent with the record at the time of her separation.

103.    The VA diagnosed Ms. Johnson with amnestic disorder immediately following her discharge and assigned a compensable disability rating under Diagnostic Code 9310, reflecting a

neurocognitive disorder based on the very same symptoms documented during service, including severe memory impairment and functional limitations.

104.    This evidence is directly relevant to the central issue before the BCNR—whether Ms. Johnson's condition was unfitting at the time of her separation—and constitutes highly probative medical evidence of both the existence and severity of her condition.

105.    Rather than engage with that evidence, the BCNR adopted its medical advisor's conclusory assertion that the VA diagnosis merely "provided clarity for [Ms. Johnson's] post-discharge diagnostic and treatment considerations," and therefore had no bearing on whether the Navy erred in finding her fit for duty. Ex. D at 2.

106.    The BCNR also failed to reconcile its conclusion that Ms. Johnson was fit for continued service with contemporaneous findings that she was unsuitable for operational duty, including disqualification from sea and overseas assignments and removal from the Surface Warfare Officer qualification track. These findings were based on the same cognitive impairments at issue before the PEB and directly contradict the Board's conclusion that there was no medical evidence of inability to serve. The BCNR did not explain this inconsistency. *Id*.

107.    This evidence directly contradicts the BCNR's statement that there was "no medical evidence" that Ms. Johnson was unable to continue to serve. The BCNR did not explain why this evidence did not constitute medical evidence of impairment or why it did not bear on her ability to perform required duties. *Id*.

108.    By failing to meaningfully consider, analyze, or reconcile this evidence, the BCNR failed to consider important aspects of the problem, ignored material contradictory evidence, and relied on conclusory reasoning unsupported by the record.

109.    The BCNR's statement that there was "no medical evidence" reflects a mischaracterization of the record and is not supported by substantial evidence. *Id*.

110.    Because the BCNR failed to consider and reconcile substantial evidence demonstrating Ms. Johnson's functional impairment, its decision is arbitrary, capricious, contrary to law, and unsupported by substantial evidence under 5 U.S.C. § 706(2)(A) and § 706(2)(E).

**COUNT III**
**Contrary to Law by Failing to Consider the Required Fitness Factors**
**(Violation of the APA 5 U.S.C. § 706(2)(A) –**
**Arbitrary, Capricious, and Otherwise Not in Accordance With Law)**

111.    Plaintiff realleges and incorporates Paragraphs 1 through 110.

112.    The BCNR's decision is contrary to law because it failed to apply the governing regulatory framework for determining unfitness, including the required fitness factors and evaluation of Ms. Johnson's actual duties.

113.    The Board stated in its decision that "[t]here was no medical evidence that [Ms. Johnson] would be unable to continue to serve" in the Navy, Ex. D at 2, and concluded that the PEB did not err when it found her fit to continue serving—despite the fact that she was found administratively "unsuitable" for overseas and shipboard service only a month later based on the same symptoms for which she had just been found fit.

114.    The BCNR's decision is contrary to law because it failed to apply the governing regulatory framework for determining unfitness, including the required fitness factors and evaluation of Ms. Johnson's actual duties.

115.    The BCNR's decision was contrary to law because it made no effort to consider the required fitness factors or Ms. Johnson's duties as required by law.

116.    The Board stated that "[t]here was no medical evidence that [Ms. Johnson] would be unable to continue to serve" and concluded that the PEB did not err in finding her fit—despite

the fact that she was found administratively "unsuitable" for overseas and shipboard service shortly thereafter based on the same symptoms. Ex. D at 2.

117.    Both DoD and Navy regulations require the consideration of three major factors when determining whether a Sailor is unfit for duty: whether (1) due to physical disability, they are unable to reasonably perform the duties of their office, grade, rank, or rating; (2) their medical condition represents a decided medical risk to their health or to the welfare of others; or (3) their medical condition imposes unreasonable requirements on the military. DODI 1332.18 § E3P3.2.; SECNAVINST 1850.4E, ¶ 3302.

118.    The BCNR made no findings as to these required factors. It did not evaluate whether Ms. Johnson could perform her duties, did not assess medical risk, and did not consider the burden imposed by her condition.

119.    Instead, the Board concluded there was "insufficient evidence" of unfitness without applying the governing criteria.  This is contrary to law. See *Yang v. United States*, 156 Fed. Cl. 1 (2021) (requiring application of the full regulatory framework).

120.    The BCNR also failed to evaluate Ms. Johnson's actual duties, as required by law. *Nyan v. United States*, 153 Fed. Cl. 234 (2021), *vacated in part on reconsideration*, 154 Fed. Cl. 463 (2021) (holding that the Navy must consider the actual duties of the Service member's assigned rating and cannot premise a finding of fitness solely on their successful completion of limited or lighter duties); *Kelly v. United States*, 69 F.4th 887 (Fed. Cir. 2023) (holding that the Board's decision is arbitrary, capricious, and unsupported by substantial evidence where it "failed to sufficiently address whether [the Plaintiff] was able to perform the common duties" of his assigned rate at his current grade).

121. The record reflects that Ms. Johnson was disqualified from operational assignments, removed from the Surface Warfare Officer qualification track, and restricted to non-operational duties—limitations directly bearing on her ability to perform the duties of her office, grade, rank, or rating.

122. The BCNR did not analyze how these limitations affected her fitness or whether she could perform the duties expected of a service member in her position.

123. The BCNR also improperly relied on Ms. Johnson's ability to perform limited or modified duties, which does not establish fitness for continued service. *See Kelly*, 69 F.4th at 887.

124. By failing to apply the required fitness factors, failing to evaluate Ms. Johnson's actual duties, and substituting a conclusory "insufficient evidence" finding for the required analysis, the BCNR applied an incorrect legal standard.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

   a.  Declare that the BCNR's determination was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence;

   b.  Remand Plaintiff's case to the Navy for a new decision in accordance with law;

   c.  Award Plaintiff interests, costs, and attorneys' fees; and

   d.  Grant such other and further relief as the Court deems just and proper.


Date: July 31, 2026                                    Respectfully submitted,


                                                       */s/ James Bernard*
                                                       HOGAN LOVELLS
                                                       CADWALADER US LLP

24

200 Liberty Street
New York, NY 10280
Telephone: (212) 918-3000
james.bernard@hlc.com

*/s/ Devin Urness*
(DC Bar #1766455)
HOGAN LOVELLS
CADWALADER US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
devin.urness@hlc.com

*/s/ Noah Ramirez*
HOGAN LOVELLS
CADWALADER US LLP
200 Liberty Street
New York, NY 10280
Telephone: (212) 918-3000
noah.ramirez@hlc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2026, I caused a true and correct copy of the foregoing to be served by CM/ECF and U.S. Mail to the parties registered to the Court's CM/ECF system.

*/s/ Devin Urness*
Devin Urness
